DA 12-0007

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 48

BOSTWICK PROPERTIES, INC.,

Petitioner and Appellant,

v.

MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION,

Respondent, Appellee and Cross-Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 09-1196C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Brian K. Gallik, Goetz, Gallik & Baldwin, P.C., Bozeman, Montana;
Matthew W. Williams, Williams and Jent, PLLP, Bozeman, Montana

For Appellee:

Brian C. Bramblett, Anne W. Yates, Montana Department of Natural
Resources and Conservation; Helena, Montana

Submitted on Briefs:   December 12, 2012
Decided:   February 26, 2013

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Bostwick Properties, Inc. (Bostwick) sought a water use permit from the Montana Department of Natural Resources and Conservation (DNRC). DNRC denied the water use permit. Bostwick petitioned for review by the District Court. The District Court agreed with DNRC that Bostwick had failed to prove no net depletion of surface water and lack of adverse effect, as required by § 85-2-360, MCA, and therefore Bostwick was required to mitigate its water usage in order to receive a water use permit. The District Court further determined, however, that Bostwick had submitted an adequate mitigation proposal, and, therefore, DNRC improperly had denied Bostwick's permit application. The District Court further noted that DNRC had exhibited bias against Bostwick. The District Court separately affirmed each of DNRC's findings, and so determined that any bias on the part of DNRC caused no prejudice to Bostwick. Bostwick appeals, DNRC cross-appeals, and we affirm.

¶2    Bostwick and DNRC present the following issues on appeal:

¶3    *Whether DNRC had authority to deny Bostwick's permit?*

¶4    *Whether DNRC and the District Court properly required Bostwick to mitigate its water usage?*

¶5    *Whether the District Court properly determined Bostwick's mitigation proposal was adequate as a matter of law?*

¶6    *Whether DNRC had the authority to require Bostwick to identify a specific water right for mitigation?*

¶7    *Whether DNRC bias substantially prejudiced Bostwick?*

2

## PROCEDURAL AND FACTUAL BACKGROUND

¶8    Bostwick filed an application for a Beneficial Water Use Permit with DNRC on December 1, 2006. Bostwick sought the water use permit for municipal use in its Lazy J South subdivision in Gallatin County, Montana. Bostwick initially sought up to 79 acre-feet per year of groundwater year round. Bostwick sought to extract this groundwater from an aquifer. DNRC designated Bostwick's water use permit application "correct and complete" on February 12, 2007, and noticed the application to the public. Montana Department of Fish, Wildlife, and Parks (FWP) and Montana Trout Unlimited (TU) objected to Bostwick's application. Both objectors later withdrew their objections provided that Bostwick reduced its water use to 76 acre-feet per year.

¶9    DNRC failed to take action on Bostwick's application within the timeframe set forth in § 85-2-310(1), MCA. Bostwick sought a writ of mandate to require DNRC to issue the water use permit, or, alternatively, to hold a hearing to force DNRC to show cause why DNRC would not grant the permit. After Bostwick sought the writ of mandate, DNRC issued a statement of opinion that denied Bostwick's water use permit. DNRC determined that Bostwick had failed to demonstrate no net depletion of surface water, as required by § 85-2-360, MCA, and had failed to prove legal availability and lack of adverse impact, as required by § 85-2-311, MCA. DNRC determined that Bostwick had demonstrated the other criteria required by § 85-2-311, MCA.

¶10    The District Court granted Bostwick's request for a writ of mandate. DNRC appealed to this Court. *Bostwick Props. v. Mont. Dep't of Nat. Res. & Conserv.*, 2009 MT 181, 351

3

Mont. 26, 208 P.3d 868 (*Bostwick I*). We reversed the District Court's grant of the writ of mandate. We determined that DNRC had no legal duty to grant Bostwick's permit application because Bostwick had not yet proven lack of adverse effect and legal availability. *Bostwick I*, ¶ 21. We remanded the case to DNRC with instructions to provide Bostwick with an opportunity to be heard on its water use permit application. *Bostwick I*, ¶ 23. Bostwick requested that DNRC disqualify itself to hear Bostwick's application on the grounds of bias. DNRC denied Bostwick's request for disqualification.

¶11 The Gallatin River is part of a closed water basin. Sections 85-2-342 to 85-2-343, MCA. In order to receive a groundwater permit, Bostwick first had to provide a hydrogeologic assessment to determine whether its proposed groundwater usage would result in a net depletion of surface water. Section 85-2-360, MCA. Bostwick would have to mitigate its water usage if Bostwick's proposed pumping of groundwater would result in a net depletion of surface water and adversely affect senior appropriators. Section 85-2-362, MCA.

¶12 Bostwick offered alternatives to demonstrate that its groundwater use would not result in a net depletion of the Gallatin River surface water, or would not cause an adverse effect. Bostwick first proposed that its Pave and Infiltrate Plan would offset all proposed consumption and would result in no net depletion of surface water. Bostwick next proposed that no net depletion would occur because the hydrological connection between the aquifer and the surface water was too attenuated and any potential adverse effect was unknown. Bostwick argued that the amount of water that it sought was too small to result in an adverse

4

effect.  Bostwick also suggested that DNRC could terminate Bostwick's water rights if Bostwick's de minimus water usage actually harmed senior rights holders.  Bostwick finally proposed mitigation in the form of purchasing Water Right No. 41H 226700, in the event that Bostwick failed to demonstrate no net depletion or lack of adverse effect.

¶13   DNRC determined that Bostwick's water use would result in a net depletion of surface water, and that Bostwick had failed to demonstrate lack of adverse effect.  This determination required Bostwick to mitigate its proposed water use.  DNRC further determined that Bostwick's proposed mitigation, purchasing Water Right No. 41H 226700, was inadequate because the mitigation would provide only irrigation season water and would provide no non-irrigation season water.  DNRC's determinations that Bostwick had failed to demonstrate no net decrease and had failed to demonstrate a lack of adverse effect for non-irrigation season water required Bostwick to mitigate non-irrigation season water loss as well.

¶14   Bostwick sought review by the District Court.  The district court agreed with DNRC that Bostwick had failed to demonstrate no net depletion and lack of adverse effect.  The District Court deemed adequate as a matter of law, however, Bostwick's mitigation proposal.  The District Court determined that DNRC improperly had denied Bostwick's water use permit subject to implementation of Bostwick's mitigation plan.  Bostwick appeals the District Court's determination that Bostwick failed to demonstrate no net depletion or lack of adverse effect.  DNRC cross-appeals on the grounds that Bostwick's mitigation proposal did not mitigate non-irrigation season water use.

## STANDARD OF REVIEW

¶15    We review for correctness a district court's review of an administrative agency's decision. *BNSF Ry. Co. v. Cringle*, 2010 MT 290, ¶ 11, 359 Mont. 20, 247 P.3d 706. We review for correctness a district court's conclusions of law. *Cringle*, ¶ 11.

## DISCUSSION

¶16    *Whether DNRC had authority to deny Bostwick's permit?*

¶17    Bostwick argues that its settlement with all objectors required DNRC as a matter of law to grant Bostwick a water use permit. DNRC instead issued a statement of opinion that provided that Bostwick had failed to show no net decrease, pursuant to § 85-2-360, MCA, and to show legal availability and lack of adverse effect pursuant to § 85-2-311(1), MCA. Bostwick argues that DNRC's previous determination that Bostwick's application was "correct and complete" deprived DNRC of any further authority to issue a statement of opinion or to deny the permit after Bostwick settled with the objectors.

¶18    We considered and rejected this argument in *Bostwick I*. The District Court in *Bostwick I* concluded that DNRC was required, as a matter of law, to grant Bostwick's permit because DNRC had determined Bostwick's application was "correct and complete," and all objections had been resolved. *Bostwick I*, ¶ 20. DNRC must grant a permit only if Bostwick resolved the objections *and* Bostwick proved the § 85-2-311, MCA, criteria by a preponderance of the evidence. *Bostwick I*, ¶ 21. Bostwick was required to prove legal availability and lack of adverse effect by a preponderance of the evidence. *Bostwick I*, ¶ 21.

6

DNRC had legal authority, and the legal duty, to deny Bostwick's permit if Bostwick failed to do so. *Bostwick I*, ¶ 21.

¶19 *Whether DNRC and the District Court properly required Bostwick to mitigate its water usage?*

¶20 Bostwick offers four theories to support its argument that its water use would result in no net depletion of surface water or would not adversely affect senior appropriators. We analyze each in turn.

*1. Bostwick's Pave & Infiltrate Plan*

¶21 Bostwick first argues that its Pave and Infiltrate Plan would offset any net depletion of surface water from its proposed pumping of groundwater. Bostwick plans to pave roads and parking lots in its proposed development. Bostwick contends that precipitation that previously had evaporated or had been used by native plants would run off these new impermeable surfaces. Bostwick would store this runoff water in retention ponds. Bostwick would discharge this runoff water from the retention ponds into the groundwater, which in turn eventually would recharge the Gallatin River. Bostwick estimated that it would collect 42 acre-feet per year of runoff water. This "savings" represents more than the 39 acre-feet per year that Bostwick seeks to deplete with its water use permit. Bostwick argues, as a result, that its development as a whole would cause no net decrease in surface water and no adverse effect.

¶22 Section 85-2-361(1), MCA, lists factors that DNRC should consider in predicting whether a water appropriation would result in a net depletion of surface water. These factors

7

include the actual amount diverted, the amount likely to be lost in conveyance, any return due to percolation, and any return flows such as wastewater. Section 85-2-361(1), MCA, further provides that these factors do not constitute an exhaustive list of criteria to consider when it evaluates net depletion of surface water. Bostwick argues that DNRC should consider the runoff caused by Bostwick's proposed development in this calculation of potential depletion of surface water. Bostwick provides no legal support to include its runoff water in the surface water depletion calculation.

¶23    We look at four factors when we interpret a statute. First, we ask whether the interpretation reflects the intent of the legislature considering the plain language of the statute. *U.S. West, Inc. v. Dep't of Revenue*, 2008 MT 125, ¶ 16, 343 Mont. 1, 183 P.3d 16. We next examine whether the interpretation comports with the statute as a whole. *U.S. West*, ¶ 16. We then consider whether an agency charged with administration of the statute has placed a construction on the statute. *U.S. West*, ¶ 16. Finally, where appropriate, we analyze whether the interpretation avoids absurd results. *U.S. West*, ¶ 16.

¶24    The plain language of § 85-2-361(1), MCA, indicates that Bostwick's interpretation of this statute fails to reflect the intentions of the legislature. The legislature listed only factors that concern the appropriated water. The analysis of the "actual amount diverted" and the "amounts that will likely be lost in conveyance" considers only the appropriated water. Similarly, the "return flow" analysis contemplates how much of the appropriated water will "return." None of these factors requires DNRC to consider sources of water other than the proposed water to be appropriated pursuant to Bostwick's permit. Nothing indicates, based

8

on the plain language of the statute, that the legislature intended DNRC to consider alternative sources of water, such as Bostwick's runoff, when it calculates net-depletion.

¶25  Bostwick's interpretation also conflicts with the statute as a whole. The legislature separately considered the role of sources of water other than the appropriated water. The legislature labeled this other water as "mitigation" water. Sections 85-2-102(15), 85-2-360 to 85-2-363, MCA. If a water allocation would result in a net depletion of surface water, the statute requires the applicant to submit a mitigation plan that would introduce a new source of water to offset any adverse effect caused by the net depletion of surface water. Section 85-2-360, MCA. The legislature clearly has directed DNRC to evaluate water other than the appropriated water as potential mitigation. It would be contrary to the statutory scheme to require DNRC instead to consider this runoff water in its net-depletion calculation.

¶26  Bostwick does not argue that it can use this runoff water as mitigation, and, indeed, it could not. The legislature defined mitigation as the "reallocation of surface water or ground water through a change in appropriation right." Section 85-2-102(15), MCA. Bostwick currently has no appropriation right to use this runoff water. The legislature clearly stated that a water use permit represents the sole way to appropriate water. Sections 85-2-301 to 85-2-302, MCA. Bostwick could not use this runoff water as mitigation water.

¶27  The agency charged with administering this statute, DNRC, concluded that it should not consider Bostwick's runoff water when it calculated net depletion. Bostwick did not argue specifically that this statute, § 85-2-361, MCA, or any legal authority, requires DNRC to consider Bostwick's runoff water as part of the net-depletion calculation. DNRC

9

concluded that no legal authority supported Bostwick's claim that DNRC should consider Bostwick's runoff as part of DNRC's net-depletion calculation.

¶28 As noted above, Bostwick has no legal right to appropriate this runoff water. A water use permit represents the sole way Bostwick could acquire an appropriation right. Sections 85-2-301 to 85-2-302, MCA. An anomalous result would occur if Bostwick could use this runoff water in its net-depletion of surface water calculation even though Bostwick has no legal right to appropriate this runoff water.

¶29 Finally, the legislature has moved away from the old-fashioned understanding of water appropriation that underpins Bostwick's claim that it can use this runoff water in the net-depletion analysis. This Court previously recognized the notion of "developing" water by tapping an underground aquifer or by bringing water to a location it otherwise would not have reached. *See State ex. rel. Mungas v. Dist. Ct.*, 102 Mont. 533, 59 P.2d 71 (1936); *Rock Creek Ditch & Flume Co. v. Miller*, 93 Mont. 248, 17 P.2d 1074 (1933). Bostwick essentially argues that it would be "developing" water by capturing runoff water. Historically, a party who "developed" water could appropriate that water ahead of senior appropriators. The legislature rejected the notion that a person could appropriate water by "developing" it. The legislature instead declared that starting in 1973, a water use permit represented the sole way to appropriate water. *See* §§ 85-2-301 to 85-2-302, MCA. This new law superseded our old cases, including *Mungas* and *Rock Creek*, regarding the ability of a party to appropriate water through the "development" of water. *See* §§ 85-2-301 to 85-2-302, MCA.

10

¶30	The legislature has adopted a system that recognizes the hydrological cycle and the adverse effect that new appropriations of surface water or ground water could cause to senior appropriators. The legislature specifically recognized that depletion of groundwater could cause a depletion of surface water. *See* § 85-2-360, MCA. The legislature now requires water use permit applicants to demonstrate that their groundwater usage in a closed basin will not adversely affect senior appropriators of surface water. Sections 85-2-360, 85-2-363, MCA. Bostwick's capture of surface water similarly could cause a depletion in the surface water or groundwater in the closed Gallatin River Basin that could adversely affect senior appropriators. The legislature's recent modifications to Montana water law confirm that the legislature did not intend to allow Bostwick to use an additional source of water, such as the runoff water, in the net-depletion of surface water calculation. *See* §§ 85-2-301 to 85-2-302, MCA.

¶31	Nothing in § 85-2-361, MCA, supports Bostwick's interpretation that DNRC should consider the runoff water caused by Bostwick's pavement when DNRC calculates the net depletion caused by Bostwick's water allocation. This interpretation would run contrary to the plain meaning of the statute, to the statutory scheme as a whole, to the DNRC's interpretation, and would cause an absurd result whereby Bostwick could claim the runoff water in the net-depletion calculation even though Bostwick would have no legal right to use the water. *See U.S. West*, ¶ 16.

*2. Attenuated Hydrological Connection*

11

¶32 Bostwick next argues that the attenuated hydrological connection between the source ground water and the surface water would cause no net depletion of surface water in the Gallatin River. Bostwick argues that the lack of net depletion of surface water related to its water extraction would not adversely affect senior appropriators. Bostwick admits that the groundwater that Bostwick seeks to extract from the aquifer ultimately would have ended up in the Gallatin River. Bostwick argues, however, that no way exists to determine at what point the Gallatin River would begin to lose water due to Bostwick's extraction of water from the aquifer. Bostwick argues that this uncertainty confirms that no net depletion, or no adverse effect, could be shown.

¶33 Bostwick points to a recent DNRC permit for new groundwater use by Yellowstone Club, *In the Matter of the Application for Beneficial Water Use Permit* 41H-30027281, as evidence that DNRC should grant the water use permit when an unknown connection exists between an aquifer and surface water. Yellowstone Club sought a water use permit several miles from Bostwick's proposed development. Yellowstone Club failed to demonstrate where or how its depletion from the aquifer would affect the Gallatin River. DNRC nevertheless granted the Yellowstone Club's water use permit because no practical way existed to establish how or when the groundwater would affect the surface water. Bostwick argues that DNRC should have applied this same principle to Bostwick's water use permit.

¶34 DNRC ultimately conceded to the District Court that it wrongly had granted the water use permit to Yellowstone Club. The District Court determined that DNRC's issuance of a water use permit to the Yellowstone Club did not establish any binding precedent that would

12

force DNRC to issue Bostwick's permit under similar circumstances. The District Court further determined that past DNRC cases and Montana law support DNRC's decision to deny a permit where uncertainty exists regarding any hydrological connection.

¶35 We agree. This Court possesses authority to reverse any arbitrary and capricious agency decision. Section 2-4-704, MCA. We may reverse an arbitrary and capricious decision of an agency, even if the agency follows its own prior arbitrary and capricious decision. DNRC correctly applied the permit criteria for Bostwick's permit application despite DNRC's failure to follow the same analysis in reviewing the Yellowstone Club's permit application.

¶36 Bostwick admits that some hydrological connection exists between the groundwater from the aquifer and the Gallatin River. Bostwick argues it is unknown exactly when Bostwick's extraction of groundwater would affect the Gallatin River. Bostwick seeks to shift the burden of proof to DNRC, however, and thereby require DNRC to grant the permit if no net depletion, and so no adverse effect, could be shown. Section 85-2-311(1)(a)(ii), MCA, clearly places the burden of proof on the applicant to demonstrate lack of adverse effect. Bostwick bears the burden of demonstrating that its efforts to pump water from the aquifer would cause no adverse effect on prior appropriators of the Gallatin River. Bostwick admits that it could not establish the effect of this proposed pumping on prior appropriators. The District Court correctly determined that Bostwick had failed to prove lack of any adverse effect.

3. *De Minimus Water Usage*

13

¶37     Bostwick next argues that the de minimus amount of water that it would deplete from the Gallatin River could not adversely affect senior water rights holders. Boswick seeks to deplete 24.1 gallons per minute. Bostwick notes that this 24.1 gallons per minute constitutes 0.035% of the lowest recorded flow on the Gallatin River. Bostwick contends that § 85-2-360(5), MCA, supports an exception for its de minimus water usage. Bostwick recognizes that its permit application predated this legislative amendment for de minimus usage. Bostwick argues that the legislature merely confirmed the law that already existed.

¶38     Section 85-2-360(5), MCA, provides that the prediction of a net depletion does not automatically mean that an adverse effect would occur. DNRC must determine whether an adverse effect exists "based on the amount, location, and duration" of the depletion "relative to the historic beneficial use." Section 85-2-360(5), MCA. This language creates no de minimus exception. It simply restates the principle that a depletion would not adversely affect any prior appropriators if sufficient water exists. Alternatively, the amendment acknowledges that if an adverse effect occurs, the amount of the adverse effect would not necessarily represent the full amount of the depletion. Further, the amended version of the statute still imposes on Bostwick the burden of proof to demonstrate lack of any adverse effect. Section 85-2-311, MCA.

¶39     DNRC correctly determined that Bostwick failed to prove lack of adverse effect, even for Bostwick's minimal 39 acre-feet per year water depletion. No legally available water exists on the Gallatin River during the irrigation season. The Gallatin Water Commissioner generally cuts off water rights each irrigation season for priority dates later than 1890. In

14

fact, in 2012, the Water Commissioner cut off water rights owners junior to 1883. Any additional depletion of water, even one as minimal as 39 acre-feet per year, potentially would adversely affect senior appropriators' water rights.

*4. Administration of Priorities*

¶40 Bostwick further argues that any adversely affected senior rights holders on the Gallatin River could force Bostwick to stop using water through the administration of priorities. Bostwick would ask this Court to shift the burden of proving lack of adverse effect and require prior appropriators to prove that Bostwick caused an adverse effect in order to protect their rights. As Bostwick has already noted, the attenuated hydrological connection would make it difficult for anyone to demonstrate an adverse effect. This situation would make it difficult for senior appropriators to protect their rights.

¶41 The clear language of § 85-2-311, MCA, demonstrates that the legislature placed the burden of demonstrating lack of any adverse effect on the applicant. The legislature closed the Upper Missouri River Basin in recognition that significantly more water claims existed than water to fulfill these prior appropriations. *Mont. Trout Unlimited v. Mont. Dep't of Nat. Res. & Conserv.*, 2006 MT 72, ¶¶ 7-8, 331 Mont. 438, 133 P.3d 224. The legislature acted to protect the water rights of the prior appropriators. We decline to approve a shift in the burden of demonstrating adverse effect that could jeopardize these prior appropriators' water rights.

¶42 *Whether the District Court properly determined Bostwick's mitigation proposal was adequate as a matter of law?*

15

¶43 Section 85-2-363(2)(g), MCA, required Bostwick to demonstrate how its mitigation plan would offset all adverse effects to all prior appropriators. Bostwick sought to mitigate its water usage with Water Right No. 41H 226700. This water right would mitigate Bostwick's water usage only during the irrigation season. This water right would not mitigate Bostwick's water usage during the non-irrigation season. DNRC denied Bostwick's permit application due to its failure to prove no net decrease of surface water and lack of adverse effect for the non-irrigation season.

¶44 The District Court determined that no adverse effect could result as a matter of law from Bostwick's water usage during the non-irrigation season. The District Court recognized that Bostwick's non-irrigation season water usage could affect adversely only one party – FWP. FWP further has stated that Bostwick's irrigation season only mitigation plan will cause FWP no adverse effect.

¶45 Michael Nicklin, an expert for Bostwick, testified that Bostwick's mitigation water would continue to flow in the river downstream to the Canyon Ferry Dam if Bostwick obtained a water right above where Interstate 90 crosses the Gallatin River. Bostwick's proposed mitigation with Water Right No. 41H 226700, would withdraw water upstream of the Interstate 90 crossing. Sufficient flow currently exists in the Gallatin River downstream from the Interstate 90 crossing to fulfill all appropriators' water rights during irrigation season. Bostwick's mitigation water would flow into the Canyon Ferry Dam, therefore, rather than being used by another appropriator. Canyon Ferry Dam would collect all of the water that Bostwick mitigates during the irrigation season.

16

¶46 Canyon Ferry Dam's role in storing water likely would protect downstream water users when Bostwick mitigates the full 39 acre-feet of water during the irrigation season, rather than spreading evenly this mitigation throughout the year. FWP represented the only party that could be adversely affected by Bostwick's irrigation season only mitigation plan. Bostwick's settlement with FWP reflects FWP's belief that it would not be adversely affected by the irrigation season only mitigation proposed by Bostwick.

¶47 We determined in *Bostwick I* that the mere fact that Bostwick had settled with objectors did not preclude DNRC from considering the § 85-2-311, MCA, criteria. *Bostwick I*, ¶ 21. Nothing here revises that determination. Bostwick's settlement with FWP should not have precluded DNRC from considering the § 85-2-311, MCA, criteria. The settlement does support the notion, however, that Bostwick's proposal would limit any adverse effect from the irrigation season only mitigation. In the unique circumstances presented here, with the Canyon Ferry Dam regulating the flow of water for downstream appropriators, the presence of only one party – FWP – potentially adversely affected during the non-irrigation season by Bostwick's proposal, and FWP's acknowledgment through its settlement that it would suffer no adverse effects during the non-irrigation season, we agree with the District Court that Bostwick demonstrated a lack of adverse effects for its proposed irrigation season only mitigation plan.

¶48 *Whether DNRC had the authority to require Bostwick to identify a specific water right for mitigation?*

17

¶49    DNRC required Bostwick to identify exactly which water right Bostwick would use to mitigate its surface water depletions. Bostwick argues that DNRC should allow it to provide details, such as amount of water, timing, location of water, and seniority of water rights, without Bostwick having to specify a particular water right.

¶50    Section 85-2-362, MCA, imposes on DNRC the duty to determine whether a mitigation plan would offset depletions effectively. Bostwick does not dispute DNRC's claim that DNRC routinely has required an applicant to identify the exact water right that the applicant plans to use for mitigation. DNRC claims that identification of the water right proves necessary to its full evaluation of a mitigation plan. This case demonstrates the need for such specificity. Bostwick's mitigation water must reach the Canyon Ferry Dam in order to mitigate effectively Boswick's net depletion. Bostwick's own expert testified that Bostwick would need to acquire for mitigation a water right that withdraws upstream from where Interstate 90 crosses the Gallatin River, a water right senior to 1890, and a water right for at least 39 acre-feet per year. Bostwick's identification of a specific water right allows DNRC to consider all of these factors when it evaluates the effectiveness of the mitigation plan. We see no prejudice caused by DNRC's requirement in light of the fact that that Bostwick could mitigate with a water right with similar specifications if Bostwick could not purchase Water Right No. 41H 226700.

¶51    *Whether DNRC bias substantially prejudiced Bostwick?*

¶52    Bostwick alleges that DNRC's bias against Bostwick during the permit application process violated Bostwick's due process rights. This Court remanded to DNRC its initial

18

denial of Bostwick's permit application. *Bostwick I*, ¶ 23. Bostwick requested that DNRC disqualify itself to hear the permit application on remand. Bostwick wanted the Attorney General to appoint a neutral party to consider Bostwick's application. DNRC refused and instead appointed Scott Irvin, a DNRC employee, to hear Bostwick's renewed request. Emails between Irvin and other DNRC employees suggested that Irvin had exhibited bias against Bostwick. Bostwick argues that the District Court improperly determined that Irvin's bias did not rise to the level of an "irrevocably closed mind" as contemplated in *Madison River R.V. Ltd. v. Town of Ennis*, 2000 MT 15, ¶ 15, 298 Mont. 91, 994 P.2d 1098.

¶53 The District Court based its no prejudice determination on the fact that it independently reached the same conclusions as DNRC. We characterize DNRC's bias as an "unlawful procedure." *Erickson v. State ex rel. Bd. of Med. Exam'r*, 282 Mont. 367, 375, 938 P.2d 625, 630 (1997). The mere existence of an error in the process does not mandate reversal. *Erickson*, 282 Mont. at 375, 938 P.2d at 630. The alleged error must have caused substantial prejudice. *Erickson*, 282 Mont. at 375, 938 P.2d at 630. Bostwick failed to show substantial prejudice. The District Court independently reached the same conclusions as DNRC, with the exception of the non-irrigation season mitigation proposal. Bostwick's failure to demonstrate substantial prejudice relieves us of the need to consider whether Irvin's bias rose to the level of having an "irrevocably closed mind." *Madison River R.V.*, ¶ 15.

¶54 Affirmed.

/S/ BRIAN MORRIS

19

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT


Justice Jim Rice, concurring.

¶55 In *Bostwick I*, Justice Nelson and I expressed dismay and concern over the Department's unfair treatment of Bostwick:

> DNRC's quick action would be commendable if it hadn't been taken to rectify DNRC's earlier malfeasance and to short-circuit a court's review of that malfeasance. Then, when Bostwick asked to be heard about the denial, DNRC obliged Bostwick by setting a hearing in front of the same official who had written the DNRC's opinion denying the permit. Whether the DNRC was attempting to be humorous or capricious, I do not know, but on its face this raises potential due process concerns.

*Bostwick I*, ¶ 29 (Rice, J., concurring); *see also* ¶ 25 (Nelson, J., concurring). Despite this rebuke, the Department continued its shenanigans after the case was remanded. E-mails recovered by Bostwick revealed Department officials celebrating the decision in *Bostwick I* and plotting a further ambush of Bostwick upon remand in these proceedings. As the District Court found, "[i]t does appear that the Department exhibited bias against Bostwick from the beginning stages of this matter." However, the District Court reasoned that because it had "upheld all but one of the Department's substantive decisions," that the agency's bias was "irrelevant."

¶56 I believe the District Court's approach to this issue put the procedural cart before the horse, and I disagree that affirming an agency's substantive decisions should necessarily

20

render a bias issue irrelevant. This Court has previously exercised supervisory control over district judge substitution because continuing the litigation could "cause uncertainty as to the validity of the District Court judge's involvement and decisions in this matter" and "risks wasting significant resources" in the event the matter would need to be retried. *Goldman Sachs Group, Inc. v. Second Jud. Dist. Ct.*, 2002 MT 83, ¶ 8, 309 Mont. 289, 46 P.3d 606. We revised the appellate rules to accommodate these concerns. *See* M. R. App. P. 14(3)(2011); *see also D.H. v. Fourth Mont. Jud. Dist. Ct.*, 2012 MT 106, ¶ 2, 365 Mont. 82, 278 P.3d 1010. We have thus recognized that an improper presiding officer can undermine the validity of an entire proceeding. Practically, it is difficult to measure the full reach of a biased decisionmaker's impact, as it can flow to the entirety of the case, including minor rulings. A litigant may be faced with arguing that bias affected each adverse decision in the case. The Legislature has provided for substitution of hearing examiners, including for bias. *See* § 2-4-611(4); § 85-2-310(1)(b), MCA; *see also In re Best*, 2010 MT 59, ¶ 22, 355 Mont. 365, 229 P.3d 1201 ("due process requires a fair and impartial tribunal"). And further, as a matter of due process, it is appropriate that the claim of bias be addressed as a threshold issue, with interlocutory review if necessary, and not as a final issue reviewed only for demonstrated prejudice.

¶57 Here, the Department's proceeding should not have been conducted in the manner it was. In my view, bias was established because the evidence demonstrated the Department's mind was irrevocably closed, and an unbiased hearing officer should have been substituted to hear the matter. If Bostwick had requested a new hearing as a remedy, I would vote to grant

21

it. However, Bostwick has not asked for such relief. Instead, Bostwick argues the bias issue simply to bolster its substantive arguments. Therefore, in light of the posture of this case, I believe the Court properly affirms on the basis of undemonstrated prejudice.

¶58 I likewise join in the Court's resolution of the remaining issues.


/S/ JIM RICE